UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE O.N. EQUITY SALES CO.,

        Plaintiff,

v.                               CASE No. 8:07-CV-1091-T-23TGW

ALLEN SAMUELS, individually and
on behalf of INTERNATIONAL
TRADING AGENCY, INC.,

        Defendant.

_____

## REPORT AND RECOMMENDATION

        This cause came on to be heard upon the plaintiff's Motion for Preliminary Injunction (Doc. 7), and the defendant's Motion to Compel Arbitration (Doc. 13). These motions concern whether arbitration should be conducted on claims asserted by the defendant against the plaintiff based upon an investment the defendant made through an individual who, for a time, was a licensed representative of the plaintiff. At least nineteen lawsuits have been filed around the country arising from these circumstances. At last count, the score stood: Plaintiff-0, Defendant-5. The five decisions upholding the

defendant's request for arbitration, moreover, are strongly supported by two Eleventh Circuit decisions involving very similar circumstances. Accordingly, I recommend that the score become 6 to 0 by granting the defendant's motion to compel arbitration. Correspondingly, I recommend that the plaintiff's motion for a preliminary injunction, as well as several ancillary motions, be denied.

## I.

This case concerns a claim for arbitration filed with the National Association of Security Dealers ("NASD") by defendant Allen Samuels and several other investors for losses they allege are due to the actions of non-party Gary Lancaster. The defendant alleges essentially that the plaintiff, O.N. Equity Sales Company ("ONESCO"), failed to supervise Lancaster during his period of employment with that company (Doc. 1-7).

ONESCO is a full-service retail broker-dealer registered in all fifty states and a member of NASD (Doc. 7, p. 4; Doc. 13, p. 2). Lancaster was employed with ONESCO as a registered representative and independent contractor from March 23, 2004, to January 3, 2005 (id.; Doc. 7-3, p. 1).

Prior to his employment with ONESCO, Lancaster, an experienced insurance salesman and investment representative, organized the Lancorp Financial Fund Business Trust ("Lancorp Fund") (Doc. 7, pp. 4-6; Doc. 1-2).   In March 2003, Lancaster generated and began circulating a Private Placement Memorandum ("PPM") to sell investor shares in the fund (Doc. 1-3).  The PPM described the Lancorp Fund as "an unregistered, closed-end non-diversified management investment company" (id. at p. 1).  Prior to investing in the Fund, individuals were required to read the PPM and execute a Subscription Agreement (id. at pp. 1-2).  Both the PPM and the agreement informed investors that amounts paid into the Fund would be held in an escrow account until the initial closing date (id. at p. 2; Doc. 1-2, p. 15).

Although the Subscription Agreement described payments as "irrevocable," it also stated that an investor's money would be promptly returned if "the Shares are not subscribed for and accepted by the Trust pursuant to the terms and conditions specified in the Confidential Memorandum" (the PPM) (Doc. 1-2, p. 15).  The PPM further provided that "at any time before or after the Initial Closing Date and before the maximum number of the Investor Shares have been sold, the Trust may terminate the

offering" (Doc. 1-3, p. 2).[1]  Another provision stated that, if any material changes to the Lancorp offering occurred prior to the closing date, Lancorp would amend or supplement the PPM (id. at p. 3).

On July 2, 2003, Samuels executed a Subscription Agreement and made an initial investment in the Lancorp Fund of $75,000 (Doc. 7, p. 11; Doc. 1-6).  According to Lancaster, changes in the insurance industry during late 2003 and early 2004 prevented Lancorp from obtaining outside insurance for investors that was an important feature of the Lancorp Fund offering (Doc. 13-3, p. 2; Doc. 13, p. 3).  Thereafter, Lancaster sought to replace the insurance element with a validated written obligation from a financial institution (id.).  A letter was sent to investors on March 12, 2004, apologizing for the delay in moving forward with the Fund and explaining the current status of insurance arrangements (Doc. 13-3, p. 5, Ex. A).  At that time, Lancaster offered a full and immediate refund to anyone whose "patience

---

[1]The PPM sets forth in bold print: "THIS OFFERING IS MADE SUBJECT TO WITHDRAWAL, CANCELLATION, OR MODIFICATION BY THE TRUST WITHOUT NOTICE" (Doc. 1-3, p. 4).  Additionally, the PPM states in two places that "[a]t any time before the maximum number of 50,000 units have been sold" Lancorp may "determine, in our sole discretion, to terminate this offering" (Doc. 1-3, pp. 10, 17).

[was] at an end" (id.).  Shortly after this letter's circulation, on March 23, 2004, Lancaster began his association with ONESCO.

A second letter was sent by Lancaster on April 5, 2004, announcing the changes in insurance coverage and requiring previous investors to sign a form that either (1) confirmed subscription participation and acknowledged the memorandum modifications, or (2) requested withdrawal of the subscription (Doc. 13-4, p. 2).  This correspondence indicated that the Lancorp Fund would become "effective" in the near future (id.).  Samuels signed the letter on April 8, 2004, to reaffirm his intention to invest in the Lancorp Fund (id.).[2]  The Lancorp Fund offering became effective on May 14, 2004 (Doc. 13, p. 4; Doc. 13-3, pp. 4, 20).  Samuels's letter of confirmation and the effective date of the Lancorp Fund both occurred while Lancaster was employed with ONESCO.  Lancaster remained a registered representative with ONESCO until January 3, 2005, when his registration was terminated (Doc. 7, p. 5; Doc. 7-3, p. 1).

---

[2]In his First Declaration, Lancaster indicates that several investors chose to withdraw their investments during the period before the Fund became effective (Doc.13-3, p. 3).  Lancaster states that he honored all requests for refunds during this time because he understood that the delays in finalizing the offering were frustrating to investors, and that dropping the insurance provision was a material change (id.).  ONESCO disagrees with the characterization of this change as "material" (Doc. 33, pp. 10-11).

The parties disagree regarding whether Lancaster disclosed his involvement with Lancorp to ONESCO.  Samuels offers a declaration of Lancaster in which he avers that, before being hired, he advised ONESCO that he had an outside business, Lancorp Financial Group, that sold annuities and insurance (Doc. 13-3, p. 3).  Additionally, Lancaster states that he called ONESCO once he knew the Fund was going to be finalized, and thereafter submitted a disclosure form to ONESCO that reported his plans to start the Lancorp Fund as a private placement on May 14, 2004 (id.). Jeffrey Bley, Vice President of Compliance with ONESCO, asserts that Lancaster never provided "express written notice," nor sought approval, regarding his involvement with the Lancorp Fund (Doc. 7-3, pp. 1-2).

Samuels invested an additional $25,000 in the Lancorp Fund on or about January 20, 2005, a few weeks after Lancaster's  employment with ONESCO came to an end (Doc. 1-7, p. 17).   Unfortunately, Lancaster apparently invested most of the Lancorp Fund assets in Megafund, which was later discovered to be a Texas-based Ponzi scheme (id. at pp. 17-19; Doc. 7, p. 6).  Due to this bad investment in Megafund, the Lancorp Fund failed and was eventually placed in receivership (Doc. 7, p. 6).  Samuels and numerous

other Lancorp investors subsequently filed arbitration claims with the NASD against ONESCO based upon its alleged failure to supervise Lancaster (Doc. 13, pp. 1-2; <u>see</u> Doc. 1-7).  In response, ONESCO has filed at least nineteen complaints in courts across the country to enjoin these arbitration claims related to Lancaster's Lancorp sales (Doc. 31, p. 1).

Plaintiff ONESCO filed a complaint in this court, seeking (1) a declaration that ONESCO has no obligation to arbitrate any claims regarding the Lancorp Fund, and (2) preliminary and permanent injunctive relief enjoining any such actions by defendant Samuels (Doc. 1, p. 15).  In its Motion for Preliminary Injunction (Doc. 7), ONESCO asserts that it is not required to arbitrate because it had no express arbitration agreement with Samuels, and there is no other basis under the NASD Code of Arbitration to compel such arbitration (<u>id</u>. at pp. 2-4).  In response, Samuels's Motion to Compel Arbitration argues that NASD rules require ONESCO to arbitrate these claims because (1) Samuels made a new investment decision regarding the Lancorp Fund while Lancaster worked for ONESCO; and (2) even if there was no new decision at that time, ONESCO failed to supervise Lancaster at

a time when they could have stopped the Lancorp offering and prevented Samuels's losses (Doc. 13, pp. 11, 14).

ONESCO has also filed various motions which ultimately seek authority to conduct court-ordered discovery. First, it requests that the preliminary injunction hearing be consolidated with trial on the merits to avoid "needless repetition of evidence" on the narrow legal issue of arbitrability (Doc. 8, pp. 2-4). In this motion, ONESCO recommends "a 6-8 week time frame" to "afford the parties ample time to complete discovery and prepare their cases" (id. at p. 2). Second, ONESCO seeks an order authorizing immediate discovery on the grounds that such discovery is "both relevant and essential" to the court's resolution of the fundamental factual dispute over the substance and timing of events giving rise to Samuels's NASD claims (Doc. 11, pp. 2, 16). Finally, ONESCO filed a motion asking for an order precluding summary disposition of Samuels's motion to compel arbitration until such time as ONESCO has had the opportunity to conduct relevant discovery (Doc. 33, p. 1). In this respect, ONESCO argues that Federal Rule of Civil Procedure 56(f) applies to bar a *de facto* summary judgment on a motion to compel arbitration "before the opposing party has had an

- 8 -

opportunity to discover evidence sufficient to create a triable issue of fact" (id. at pp. 5-6).[3]

Defendant Samuels has responded with a motion requesting an order precluding discovery in this case, as well as memoranda in opposition to each of the plaintiff's discovery motions (Docs. 14, 16, 17, 39). In these documents, Samuels argues that this court can summarily decide that Samuels's NASD claims are arbitrable based on the memoranda and documentary evidence already submitted, and that additional discovery would result in needless expense and delay (Doc. 14, pp. 4-10; Doc. 16, p. 1; Doc. 17, pp. 2-4). Samuels additionally contends that permitting discovery would improperly allow ONESCO to obtain court-ordered discovery on the merits of the underlying dispute (Doc. 14, pp. 17-19; Doc. 16, pp. 9-10).

The plaintiff's motion for a preliminary injunction and the defendant's motion to compel arbitration have been referred to me for a report and recommendation (Docs. 10, 38). The other motions have been referred

---

[3]With this motion, ONESCO filed a Rule 56(f) affidavit specifying the numerous factual questions it believes must be answered through discovery before the court can determine the arbitrability of the defendant's claims (see Doc. 33-2, pp. 3-6).

to me, as well (Docs. 12, 38).  A hearing has been conducted on the motion

for preliminary injunction and the motion to compel arbitration.

## II.

The appropriate focus in this case is upon the standards for

compelling arbitration rather than upon the standards for granting a

preliminary injunction.  Thus, if the requirements for arbitration are met, the

request for a preliminary injunction against arbitration would correspondingly

fail.

When a court is presented with a motion to compel arbitration,

it must first "determine whether the parties agreed to arbitrate that dispute."

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626

(1985).  The Supreme Court has established that the duty to arbitrate is a

contractual matter, and "a party cannot be required to submit to arbitration any

dispute which he has not agreed so to submit."  AT&T Technologies, Inc. v.

Communications Workers of America, 475 U.S. 643, 648 (1986).

If the existence of an arbitration agreement has been established,

the court must next determine whether the agreement governs the particular

dispute between the parties.  Id. at 649.  In making this decision, a court

cannot consider the merits of the parties' claims.  <u>Id</u>.  Additionally, the Supreme Court  has noted that the Federal Arbitration Act ("FAA") requires "any doubts concerning the scope of arbitrable issues [to] be resolved in favor of arbitration."  <u>Moses H. Cone Memorial Hospital</u> v. <u>Mercury Construction Corp.</u>, 460 U.S. 1, 24-25 (1983).

## III.

This case is not as complex or convoluted as the parties' papers indicate.  The plaintiff, in particular, seeks to obfuscate the issues by ignoring controlling precedent and by asserting purported factual disputes that go to the merits of the defendant's claims and not the question of arbitrability.  As indicated, five district courts have ruled against the plaintiff's attempt to prevent arbitration of claims arising from the Lancorp Fund investment.[4]  Even more significant, there are two Eleventh Circuit decisions that set forth the governing principles in this type of case.  <u>Mony Securities Corp.</u> v. <u>Bornstein</u>, 390 F.3d 1340 (11th Cir. 2004); <u>Multi-Financial Securities Corp.</u>

_____

[4]<u>See</u> <u>O.N. Equity Sales Co.</u> v. <u>Gibson</u>, ___ F.Supp.2d ___, 2007 WL 2840400 (S.D. W.Va. 2007); <u>O.N. Equity Sales Co.</u> v. <u>Robinson</u>, 2007 WL 2840477 (E.D. Va. 2007); <u>O.N. Equity Sales Co.</u> v. <u>Venrick</u>, 508 F.Supp.2d 872 (W.D. Wash. 2007); <u>O.N. Equity Sales Co.</u> v. <u>Pals</u>, 509 F.Supp.2d 761 (N.D. Iowa 2007); <u>O.N. Equity Sales Co.</u> v. <u>Steinke</u>, 504 F.Supp.2d 913 (C.D. Cal. 2007).

v. <u>King</u>, 386 F.3d 1364 (11th Cir. 2004).   The plaintiff's motion for preliminary injunction does not discuss any of these cases (Doc. 7).[5]

   The Eleventh Circuit decisions in <u>Bornstein</u> and <u>King</u> establish that there is a binding arbitration agreement in this case. ONESCO and Samuels concur that there is no express agreement to arbitrate disputes between them (Doc. 7, p. 16).   However, even when no express agreement exists, the NASD Code of Arbitration "serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants." <u>Multi-Financial Securities Corp.</u> v. <u>King</u>, <u>supra</u>, 386 F.3d at 1367.

---

[5]An Iowa court in this series of cases criticized the parties' use of "canned briefs," pointing out that such use does not excuse the failure to acknowledge controlling circuit precedent. <u>O.N. Equity Sales Co.</u> v. <u>Pals</u>, <u>supra</u>, 509 F.Supp.2d at 764 n.1.  The same criticism is warranted here. While the plaintiff did refer to the <u>Bornstein</u> and <u>King</u> decisions, it did so only to the extent of quoting a sentence fragment from each case that fails to reflect the holding in the case (Doc. 7, pp. 18, 19).

  What's worse, counsel for ONESCO not only ignored the governing Eleventh Circuit principles, but argued at the hearing that the Fifth Circuit's decision in <u>California Fina Group, Inc.</u> v. <u>Herrin</u>, 379 F.3d 311 (5th Cir. 2004), was persuasive on the contention that in these circumstances there is not a presumption in favor of arbitration.  Indeed, quotes from the Fifth Circuit case were enlarged and included in a packet the plaintiff submitted to the court at the hearing.  However, the Eleventh Circuit in <u>Bornstein</u>, 390 F.3d at 1342 n.1, had expressly disagreed with the proposition set forth in the Fifth Circuit decision.

Samuels seeks to compel arbitration under NASD Rule 10301(a)

(Doc. 13, pp. 5-6).  That rule provides (id. at p. 6):

> Any dispute, claim, or controversy eligible for
> submission under the Rule 10100 Series between a
> customer and a member and/or associated person
> arising in connection with the business of such
> member or in connection with the activities of such
> associated persons shall be arbitrated under this
> Code, as provided by any duly executed and
> enforceable written agreement or upon the demand
> of the customer.

Thus, the rule mandates arbitration if the investor can show that the claim (1)
"involves a dispute between a member and a customer or an associated person
of the member and a customer" and (2) "arises in connection with the business
activities of the member or in connection with the activities of the associated
person."  Multi-Financial Securities Corp. v. King, supra, 386 F.3d at 1367.

The Bornstein and King decisions establish that, with respect to
this two-part test, the defendant satisfies the first part, which requires that he
be a "customer."  The plaintiff argues that this part of the test is not met
because it had no agreement or dealings directly with the defendant (Doc. 7,
pp. 17-18).  However, Bornstein and King demonstrate that such a direct
relationship is not necessary for the defendant to be considered a customer.

-13-

The Eleventh Circuit in <u>King</u> pointed out that "[t]he NASD generally defines the term 'customer' as anyone who is not a broker or a dealer." 386 F.3d at 1368. The court concluded that, in light of that broad definition, the investor in that case satisfied the "customer" requirement because she was not a broker or dealer, even though she was not a direct customer of the NASD member. <u>Id</u>. It was enough to make the investor a "customer" that she was a customer of an associated person of a member. <u>Id</u>. at 1370.

This interpretation of NASD Rule 10301(a) was confirmed in <u>Bornstein</u>. There, the court held that the investors "are customers under the applicable NASD Rules because it is undisputed that they are customers of the [representative], and that [the representative] was an associated person with [the member]." 390 F.3d at 1344. The court considered it "irrelevant" that the investors invested with an unrelated company and that their only connection to the member was through an intermediary. <u>Id</u>.

<u>Bornstein</u> and <u>King</u> clearly show that the defendant is a "customer" within the meaning of Rule 10301(a). Thus, at the pertinent times, the plaintiff was an NASD member, Lancaster was an associated person of the

plaintiff, and the defendant was a customer of Lancaster.  Moreover, there is nothing about these determinative facts that warrants discovery.  Id. at 1346.

The defendant also meets the second part of the two-part test, which requires that the claims arise in connection with the business activities of the member.  A primary focus of the defendant's claims is that the plaintiff failed to investigate Lancaster and negligently supervised him during the period Lancaster was employed by the plaintiff (Doc. 1-7, Ex. E).  The Eleventh Circuit in King pointed out that "[t]he NASD requires that its members supervise the activities of their associated persons, as part of their business."  386 F.3d at 1370.  Accordingly, the court concluded that the investor's "claim of negligent supervision satisfies the Code's second arbitration condition."  Id.  The court in Bornstein echoed this conclusion, stating that "the Eleventh Circuit and most other courts hold that supervision of associated persons arises in connection with the member's business."  390 F.3d at 1344-45.

In this case, the defendant claims that the plaintiff was negligent in supervising Lancaster during the time Lancaster was working for the plaintiff.  As indicated, the NASD imposes a duty upon its members to

supervise its associated persons.  Therefore, the defendant's claims arise in connection with the plaintiff's business.

The plaintiff seeks to avoid this conclusion by misconstruing the defendant's claims to be based upon actions that took place before Lancaster was associated with the plaintiff.  Thus, the plaintiff contends that the dispute did not arise "in connection with" its business because Lancaster was not a representative of ONESCO at the time of Lancaster's alleged misrepresentations and omissions, nor at the time that the defendant signed the Lancorp Fund Subscription Agreement (Doc. 7, pp. 18-22).  However, this contention ignores the fact that the stated basis for the defendant's claims is the plaintiff's failure to supervise Lancaster during his term of employment, not at any time prior to that period (Doc. 1-7, Ex. E, pp. 3-14).[6]

By misconstruing the defendant's claims, the plaintiff seeks to rely upon Wheat, First Securities, Inc. v. Green, 993 F.2d 814 (11th Cir. 1993), to support its objection to arbitration on the ground that Lancaster made the alleged misrepresentations that induced Samuels to enter into the subscription

---

[6]At the hearing on these motions, defendant's counsel affirmed that Samuels is not seeking any relief for claims based on what Lancaster said before he was hired by the plaintiff.  Any references to representations made by Lancaster before his ONESCO association will be used simply as background.

agreement before he was associated with the plaintiff (Doc. 7, pp. 18-19, 21-22).  The Eleventh Circuit in <u>Wheat</u> held that customer status under the NASD Code is "determined as of the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint."   <u>Id</u>. at 820.   However, the court explained subsequently in <u>Bornstein</u> that <u>Wheat</u> is inapposite to the situation presented here.   <u>Mony Securities Corp.</u> v. <u>Bornstein</u>, <u>supra</u>, 390 F.3d at 1345-46.

In <u>Wheat</u>, the allegedly fraudulent stock purchases were made well before the representative became associated with the NASD member. 993 F.2d  at 816.  The plaintiff argues that here the relevant date is July 2, 2003, which is the date that Samuels signed his "irrevocable" Subscription Agreement (Doc. 7, p. 21).

However, both the PPM and the Subscription Agreement provided that Samuels's money was to be held in escrow until Lancorp Fund's closing date and that Lancaster had complete discretion to modify, withdraw or cancel the offering at any time up until that date.  Importantly, that closing date did not occur until May 14, 2004, two months after Lancaster had become a registered representative with the plaintiff.  In addition, Lancaster

made a change to the offering that required Samuels to confirm or rescind his decision to invest in Lancorp.  Samuels made his new decision to invest on April 8, 2004, also during Lancaster's employment with the plaintiff.

The defendant argues that, "[i]f ONESCO had properly supervised Lancaster, it could have stopped the Lancorp offering and directed him to return all funds to his customers.  No losses would then have occurred" (Doc. 13, p. 5).  The circumstances of this case therefore establish that Samuels was clearly a "customer" at the time his investment in the Lancorp Fund became binding and effective, and that his claims arise in connection with the business of a member to supervise its associated persons.  In short, the defendant is entitled to arbitrate his claims under NASD Rule 10301(a).

It is appropriate to add that, contrary to the plaintiff's assertion, the Eleventh Circuit, as previously noted, recognizes a presumption in favor of arbitration.  Mony Securities Corp. v. Bornstein, supra, 390 F.3d at 1342 n.1.  However, here, as in Bornstein, it is unnecessary to call that presumption into play.  Nevertheless, the presumption reinforces the conclusion that arbitration is proper in this case.  See O.N. Equity Sales Company v. Gibson, ___ F.Supp.2d ___, 2007 WL 2840400 (S.D. W.Va. 2007).

IV.

As part of the plaintiff's effort to forestall arbitration, it has filed several motions asserting that discovery is needed in this case.  Specifically, it has filed a motion to consolidate a preliminary injunction hearing with a trial on the merits (after completing discovery) (Doc. 8), a motion authorizing immediate discovery (Doc. 11), and a motion under Rule 56(f), F.R.Civ.P., to delay ruling on the defendant's motion to compel arbitration pending discovery (Doc. 33).

Discovery is not warranted in this case.  No discovery was allowed in the five district court cases previously cited that compelled arbitration contrary to the plaintiff's request for preliminary injunctive relief.[7] In addition, four other district courts have ruled against the plaintiff's request for discovery in these circumstances.[8]

---

[7] See footnote 4, supra.

[8] See O.N. Equity Sales Co. v. Cui, 2007 WL 3071553 at *1 (N.D. Cal. 2007) ("immediate discovery is not required to determine the issue of arbitrability"); O.N. Equity Sales Co. v. Prins, 2007 WL 3052756 at *1 (D. Minn. 2007) ("Permitting discovery at this time would improperly allow ONESCO to obtain court-ordered discovery on the merits that it could not otherwise obtain in the arbitration" and "arbitrability can be resolved by the Court based on the memoranda and evidence already submitted"); O.N. Equity Sales Co. v. Rahner, 2007 WL 2908297 at *1 (D. Colo. 2007) ("ONESCO has failed to demonstrate that immediate discovery is required ... to determine the issue of arbitrability"); Order Staying Proceedings Pending Ruling on Motion to Compel

Moreover, under the two-part test in <u>Bornstein</u> and <u>King</u>, the determinative facts are few.  In this case, there is no dispute about the basic facts that were relied upon to conclude that the defendant met the requirements of that test.  Consequently, here, as in <u>Bornstein</u>, the court should be "unconcerned with [the plaintiff's] cornucopia of disputed facts." 390 F.3d at 1346.

## V.

For these reasons, I recommend that the defendant's Motion to Compel Arbitration (Doc. 13) be granted, and the plaintiff's Motion for Preliminary Injunction (Doc. 7) be denied.  In light of the recommendation to compel arbitration, I recommend further that the following motions be denied: (1) Plaintiff's Motion to Consolidate Preliminary Injunction Hearing with Trial on the Merits (Doc. 8); (2) Plaintiff's Motion for an Order Authorizing Immediate Discovery on the Issue of Arbitrability (Doc. 11); (3) Defendant's Motion for Protective Order (Doc. 14); and (4) Plaintiff's Motion under Civil Rule 56(f) for an Order Precluding Summary Disposition of Defendant's

---

Arbitration, <u>O.N. Equity Sales Co.</u> v. <u>Scott,</u> Case No. 4:07cv269-RH/WCS (N.D. Fla. Sept. 7, 2007) (order denying ONESCO's motion for commencement of discovery).

Motion to Compel Arbitration Pending Discovery to be Taken on the Issue of

Arbitrability (Doc. 33).


Respectfully submitted,

DATED: NOV. 30, 2007         THOMAS G. WILSON
                             UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and

recommendations contained in this report within ten days from the date of its

service shall bar an aggrieved party from attacking the factual findings on

appeal.  28 U.S.C. 636(b)(1).